

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

225 EAST CAPITOL STREET HOTEL, LLC
AND CW OLD, LLC                                                              PLAINTIFFS

v.                                           CIVIL ACTION NO. 3:22cv700-CWR-FKB

BARSALA INTERNATIONAL, INC.                                                  DEFENDANT

---

**VERIFIED COMPLAINT FOR EMERGENCY TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION, AND OTHER RELIEF**

---

COME NOW, 225 East Capitol Street Hotel, LLC and CW Old, LLC (hereinafter "Owners" or "Plaintiffs") and file this Verified Complaint for Emergency Temporary Restraining Order, Preliminary and Permanent Injunction, and Other Relief ("TRO Complaint") against Barsala International, Inc. (hereinafter "Barsala" or "Defendant") and would show as follows:

### I.   NATURE OF ACTION

1.   This TRO Complaint seeks an emergency temporary restraining order followed by a preliminary and permanent injunction, pursuant to Federal Rule of Civil Procedure 65, to prevent the immediate and irreparable injury, loss, or damage that Plaintiffs would incur if Defendant were allowed to continue possessing and operating certain properties owned by Plaintiffs.

### II.   PARTIES

2.   225 East Capitol Street Hotel, LLC is a Mississippi limited liability company. Its sole member is Gera Development, LLC ("Gera"), a Texas limited liability company. Gera's

1

two members are Amit Goel, who is an individual resident of Texas, and Dinesh Goel, who is an individual resident of Mississippi.

3. CW Old, LLC is a Mississippi limited liability company. Its sole member is Gera. Gera's two members are Amit Goel, who is an individual resident of Texas, and Dinesh Goel, who is an individual resident of Mississippi.

4. Barsala International, Inc. is a Delaware corporation with a principal place of business located at 225 S. King Street, Suite #800, Seattle, Washington 98104.

### III.  JURISDICTION

5. This Court has jurisdiction over this case pursuant 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. Complete diversity exists because Plaintiffs are considered citizens of Texas and Mississippi and Defendant is a citizen of Delaware and Washington.

7. The amount is controversy is satisfied because Defendant is unlawfully exerting control over Plaintiffs' Properties (hereinafter defined) and harming the value of Plaintiffs' business and Properties, which are worth millions of dollars. *See Nationstar Mortg. LLC v. Knox*, 351 F. App'x 844, 848 (5th Cir. 2009) ("'In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.'") (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).

### IV.  VENUE

8. Venue is proper in the Southern District of Mississippi, Northern Division, because Defendants are wrongfully asserting possession and control over property located in

Hinds County, Mississippi and Defendant's wrongful actions occurred there. *See* 28 U.S.C. § 1391(b)(2).

## V. FACTUAL BACKGROUND

### A. The Management Agreements

9. On or about February 7, 2022, Owners and Defendant entered into a Management Agreement and a Short-Term Rental Management Agreement (individually the "Management Agreement" and "Short-Term Rental Management Agreement" and collectively the "Management Agreements"). True and correct copies of the Management Agreement and Short-Term Rental Management Agreement are attached as Exhibits "A" and "B," respectively.

10. Under the Management Agreement, Defendant was to provide certain management services for multifamily residential properties located at 245 and 225 East Capitol Street, Jackson, Mississippi 39201, commonly knowns as the Walthall Lofts and the Courthouse Lofts at The Walthall, respectively (individually the "Walthall Lofts" and "Courthouse Lofts" and collectively the "Properties"). *See* Ex. "A."

11. Under the Short-Term Rental Management Agreement, Defendant was to provide certain short-term rental management services for the Courthouse Lofts. *See* Ex. "B."

### B. Termination of the Management Agreements

12. Defendant failed to satisfactorily fulfill its obligations under the Management Agreements.

13. Consequently, on September 15, 2022, Owners terminated Defendant for a cause. A true and correct copy of the September 15, 2022 Termination Letter is attached as Exhibit "C."

66694827.v1

14. As set forth in the Termination Letter, Defendant was grossly negligent in performing its obligations under the Management Agreements in the following non-exhaustive ways:

- Failure to properly oversee third-party furniture install company, which resulted in, among other things, furniture being installed incorrectly and low-quality materials being installed (e.g., plastic sheets and no comforters);
- Failure to appropriately staff Project, including hiring an inadequate property manager with no experience to oversee Project launch;
- Failure to timely submit accounting reports and/or include information necessary to capture full Project;
- Failure to pay vendors in a timely manner, which causes issues with service;
- Failure to check condensing units for mold, which has damaged units;
- Failure to return security deposits due to funds being misappropriated for other uses;
- Failure to maintain dog park;
- Failure to walk "move outs" to ensure that units are clean;
- Failure to maintain an organized and presentable office space; and
- Failure to secure furniture and appliances from possible theft.

*See* Ex. "C," Termination Letter at p.1. Furthermore, Defendant failed to perform standard operational inspections of all units on a regular basis to ensure units are in good condition without causes of damage, including, but not limited to, water leaks, running commodes, improper function of HVAC systems, inoperable door locks, buckling floors, windows left open, and garbage and debris left inside and outside units.

15. Additionally, Owners cited the following non-exhaustive list of safety issues caused by Defendant's repeated failures to perform its obligations under the Management Agreements:

- Failure to close and/or lock door leading onto roof area;
- Failure to close and/or lock rooms storing valuable supplies and materials, including maintenance supplies and furniture;
- Failure to secure multiple units;
- Failure to maintain and clean roof deck;
- Failure to ensure that every unit has a functioning HVAC system; and
- Failure to ensure that water does not drip from AC units or vents onto carpet.

4

*Id.* at p.2.

16. To avoid any doubt that the Management Agreements were being terminated, the Termination Letter alternatively terminated the Management Agreements under the at-will provision. *See id.* p.1 (citing Sections 5.4 and 5.5 of the Management Agreement and Sections 7.2.4 and 7.2.5 of the Short-Term Rental Management Agreement).

17. Section 5.5 of the Management Agreement provides in relevant part: "In addition to Owner's right to terminate this Agreement under Sections 5.1 through 5.4, either party may terminate this Agreement by giving the other party at least thirty (30) days' prior written notice of such termination, and this Agreement will terminate on the date stated in that notice or on the 30th day after that notice is delivered, whichever is later." Ex. "A," Management Agreement at § 5.5.

18. Section 7.2.5 of the Short-Term Rental Management Agreement provides in relevant part: "Notwithstanding anything in this Agreement to the contrary, if the Management Agreement is terminated, this Agreement will be deemed to have been terminated on the date of that termination, unless within five (5) days of the termination of the Management Agreement, the Owner provides Barsala written notice of non-termination of this Agreement." Ex. "B," Short-Term Rental Management Agreement at § 7.2.5.

19. In other words, assuming *arguendo* that the Management Agreements were not terminated immediately for cause, termination of the Management Agreements was still effective within 30 days of the Termination Letter, or October 15, 2022.

**C.   Negotiation Attempts and Interim Short-Term Rental Management Services**

20. After the Management Agreements were terminated, Owners hired Adcock Properties ("Adcock") as the new property manager for the Properties.

5

66694827.v1

21. Owners and Defendant began negotiating a Termination and Release that would govern the final, agreed upon disbursement of funds and disposition of certain personal property and furniture as a result of the Management Agreements being terminated.

22. At Defendant's request, while the Termination and Release was being negotiated, Owners orally agreed to allow Defendant's onsite employee and her family continue living at the Courthouse Lofts free-of-charge and to handle only short-term rental bookings through the end of the year.

**D.     The Cease and Desist Letter**

23. On November 30, 2022, Owners instructed Defendant to not offer short-term rentals below the minimum rate of $120.00 per night.

24. This minimal rental rate is vitally important to Owner's operations because it impacts the overall market rate for the Property and the overall value of the Property, which is based in part on nightly rental rates.

25. Defendant blatantly ignored Owners' instructions and offered the Property for rent for less than $120.00 per night.

26. Furthermore, Defendant accepted bookings beyond January 1, 2023, again, in direct defiance of the Owners' instructions.

27. As a result of Defendant taking actions contrary to the explicit instructions of the Owners, the Owners sent a cease and desist demand on December 1, 2022 (the "Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached as Exhibit "D."

28. Also on December 1, 2022, Defendant sent Owners what appears to be a draft letter from attorney Paul Gunn with the law firm Watkins & Eager, PLLC, which was unsigned

and not on firm letterhead (the "Response Letter"). A true and correct copy of the Response Letter is attached as Exhibit "E."

29. The Response Letter purports to be a response to the Termination Letter (sent months earlier) and sets forth terms that materially differ from prior versions of the Termination and Release the parties had been discussing.

30. The Cease and Desist Letter acknowledged receipt of Defendant's Response Letter, but explained:

> Barsala can make its arguments to a judge or an arbitrator in a formal legal action; however, in the meantime, ***Barsala has no right to possess or occupy or operate the Property, such rights being solely vested in the Owners***. If Barsala does not comply with this cease and desist demand, the Owners will take all steps and necessary legal action to have Barsala removed from the Property and to have all Barsala marketing of the Property removed.

Ex. "D," Cease and Desist Letter at p.2 (emphasis added).

**E.  Defendant's Egregious Actions that Forced Owners to File this TRO Complaint**

31. Rather than abide by the Cease and Desist Letter, Defendant vindictively began intentionally trying to harm the Owners' business, grossly interfering with customers, and devaluing the Properties.

32. For example, Owners had a customer who anticipated renting all available rooms the weekend of December 3, 2022. So, on November 30, 2022, Owners instructed Defendant to block off all available rooms and send a list of those rooms to the Owners. A true and correct copy of the email thread is attached as Exhibit "F."

33. Defendant initially complied with the request and sent Owners a list of rooms that had been blocked off. *See id.* at 11/30/22 email at 6:19pm from Barsala employee, Valerie Trevino.

34. Yet, after receiving the Cease and Desist Letter, the onsite Barsala employee was instructed by the corporate office to cancel the room block, consider the Owner's clients to be trespassers, and call the police on the "trespassers" when they checked into their rooms. A true and correct copy of the email from Adcock recounting this event is attached as Exhibit "G."

35. Addtionally, Defendant began advertising rooms from the room block for $200.00 per night, rather than the rate of $350.00 per night, which the Owners had quoted for that weekend.[1]

36. Owners ultimately missed out on at least 55 anticipated room rentals because the advertised price discrepancies caused the prospective customers to rent rooms from a competitor. *See* Ex. "G."

37. Despite the number of unplanned vacancies caused by Defendant's intentional misconduct, Defendant still double-booked rooms that had already been checked into by Owners' customers in a further attempt to damage the Owners and the overall reputation of the Properties.

**COUNT I – REQUEST FOR TEMPORARY RESTRAINING ORDER**

38. Plaintiffs incorporate and reallege the preceding paragraphs of this TRO Complaint.

39. Defendant's actions have caused and will continue to cause immediate and irreparable harm to Plaintiffs.

40. Plaintiffs do not have an adequate remedy at law to redress the conduct alleged in this TRO Complaint.

---

[1] The Southwest Athletic Conference ("SWAC") Championship football game allowed rooms to demand a higher rental rate that weekend.

41. Defendant's actions have already harmed Plaintiffs' goodwill and business reputation by advertising the Properties at lower, unauthorized rental rates and by mistreating customers.

42. Defendant's actions have already caused and will continue to cause customers and prospective customers to not rent the Properties and, instead, rent from competitors.

43. Moreover, if Defendant is allowed to continue devaluing the Properties, as it is intentionally doing, there is an imminent threat that the devaluation could trigger certain loan covenants that require specific loan-to-value ratios. This could force the Owners to make significant expenditures to comply with the covenants.

44. Plaintiffs are likely to succeed on the ultimate merits of this case.

45. This lawsuit presently does not seek resolution of amounts owed following termination of the Management Agreements; instead, the requested injunction is limited to Defendant's continued unlawful exertion of control over the Properties despite demands by the Owners to immediately cease and desist.[2]

46. The Court need not resolve whether Defendant was properly terminated for cause at this point. The Termination Letter alternatively terminated the Management Agreements under the at-will termination provision, which made termination effective within 30 days (or October 15, 2022).

47. Any exertion of control over the Properties by Defendant after October 15, 2022, without Owners' consent is unlawful.

48. Next, the threatened injury to Plaintiffs if a TRO is not granted outweighs any threatened harm to Defendant.

---

[2] So that the record is clear and the for the avoidance of any doubt, Plaintiffs reserve the right to file an amended complaint or file a separate lawsuit if agreeable terms in the Termination and Release cannot be reached.

66694827.v1

49. Indeed, Defendant's compensation is based on net operating income of the Properties and, under Defendant's mismanagement and intentional acts designed to harm the Properties, the net operating income is negative. Thus, Defendant's would have no damages as a result of granting a TRO. Moreover, issuing a TRO would actually mitigate damages because it would put an end to the harm that Defendant is intentionally inflicting.

50. Finally, granting the TRO will not disserve the public interest. To the contrary, the public will be harmed if Defendant is allowed to continue its conduct, including double-booking rooms and threatening lawful guests that they will be arrested for trespassing.

51. Given Defendant's track record of retaliation, the undersigned certifies that providing prior notice of a TRO hearing should not be required because there is a grave risk that Defendant will retaliate again once it learns of this TRO Complaint, just like it did after receiving the Cease and Desist Letter. Nevertheless, once this TRO Complaint has been filed and a hearing has been set, the undersigned certifies that he will notify Defendant's attorney, Paul Gunn, of the date and time of the hearing via email.

52. Plaintiffs are prepared to post a bond in an amount the court determines to be proper in accordance with Federal Rule of Civil Procedure 65(c).

**COUNT II – REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTION**

53. Plaintiffs incorporate and reallege the preceding paragraphs of this TRO Complaint.

54. Within 14 days of the TRO (or such later date if the TRO is extended), Plaintiffs request a hearing and that subsequently a preliminary and/or permanent injunction be entered that prohibits Defendant, and its officers, agents, servants, employees, and representatives, from entering onto or exerting any control over the Properties, including, but not limited to, managing

66694827.v1

the Properties, handling bookings for the Properties, or advertising the Properties in any way and in any medium.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A. Immediately enter a temporary restraining order enjoining Defendant, and its officers, agents, servant, employees, and representatives, from setting foot on the Properties, from managing the Properties, handling bookings for the Properties, or advertising the Properties in any way and in any medium;

B. Enter an order permanently enjoining Defendant, and its officers, agents, servant, employees, and representatives, from setting foot on the Properties, from managing the Properties, handling bookings for the Properties, or advertising the Properties in any way and in any medium; and

C. Award such further relief that is warranted under the circumstances.

Respectfully Submitted,

225 EAST CAPITOL STREET HOTEL, LLC AND
CW OLD, LLC

By their attorneys,

*Samuel Gregory*
Samuel D. Gregory (MB # 104563)

OF COUNSEL:

Samuel D. Gregory (MB# 104563)
BUTLER SNOW LLP
1020 Highland Colony Pkwy, Ste 1400
P.O. Box 6010
Ridgeland, MS 39158
T: (601) 948-5711
F: (601) 985-4500
E: sam.gregory@butlersnow.com

66694827.v1

## VERIFICATION

STATE OF TEXAS

COUNTY OF **Harris**

Personally appeared before me, the undersigned authority in and for the jurisdiction aforesaid, AMIT K. GOEL, who, on behalf of 225 East Capitol Street Hotel, LLC and CW Old, LLC, as the majority membership unit owner of their sole member, Gera Development, LLC, on oath states that the matters and things set forth in the foregoing TRO Complaint are true and correct as therein stated to the best of his knowledge, information, and belief based upon information currently available to him.

_____
AMIT K. GOEL

Sworn to and subscribed before me on December **5th**, 2022.

CRYSTAL JONES-BELLE
Notary Public, State of Texas
Comm. Expires 10-01-2026
Notary ID 131743535

_____
Notary Public

My Commission Expires: **10/1/2026**